# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72331-6-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| DENNIS ARMSTRONG, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 29, 2016 |

SPEARMAN, C.J. — Dennis Armstrong was convicted of domestic violence felony violation of a court order. He appeals, arguing that his constitutional right to a unanimous jury verdict was violated when the jury was expressly instructed that they did not have to be unanimous as to the means of committing the charged offense. He also argues that his due process rights were violated because the State failed to preserve potentially exculpatory evidence from a nearby surveillance camera. We find no error and affirm.

## FACTS

On April 20, 2014, Nadia Karavan was living at a residence on Orcas Street in Seattle known as the "Bunkhouse." Verbatim Report of Proceedings (VRP) (7/29/14) at 35-6. At that time she had a no-contact order against her boyfriend, Dennis Armstrong, but she had some of his belongings that she wanted to return to him. Karavan was eating dinner when another resident told

her that Armstrong was outside. Karavan walked outside the residence and saw Armstrong sitting at a bus shelter about a block away. Id. at 39. She went to the bus stop to tell him that she was going to give his things back to him. Id.

Armstrong appeared to have been injured and became angry at Karavan when she arrived. They struggled and Armstrong hit Karavan. Karavan ran into a nearby Arco AM/PM store and asked the cashier to call the police. Armstrong followed her inside and said not to call the police.

Todd Hawkins, the clerk on duty, called 911 and Karavan spoke with the dispatcher. Police officers located Armstrong a couple of blocks away and apprehended him. The officers questioned him about the incident and urged him to tell the truth, because they were going to get a video recording of the incident and compare it to Armstrong's account. The questioning was recorded on the police in-car video system and presented as an exhibit at trial.

Hawkins testified "that video surveillance was taken of the whole incident because I reviewed it myself right after the incident," but that "the portion of the video that I mainly saw and focused on was what was happening in the store. VRP (7/30/14) at 45-47. He testified that there were roughly 16 cameras on the premises, with 2-3 covering the gas pumps. "They basically ... cover just the gas pumps. You may see a slight view, low view shot, of maybe the bus stop, a small piece of the sidewalk. But that's it." Id. at 47.

Officer Martin was in training with Officer Elliott when they responded to the scene and spoke with Karavan. She testified that she did not personally investigate the presence of surveillance video at the Arco AM/PM. She heard

2

Officer Elliott "ask about it," but was "unaware of what the answer...was, whether there was surveillance or not." Id. at 72-73. She testified that "I assumed it was the responsibility of someone else that was at the scene." Id. at 73. Detective Christiansen also did not investigate any video at the AM/PM because he "didn't know they existed." Id. at 86.

Officer Rodrigue, who responded as backup and questioned Armstrong, testified that "Officer Elliott said there was a video at the store. And then I followed up on his key, being that there was a video." VRP (7/30/14) at 30-31. He testified that "I am not sure if there was or wasn't. I didn't go back to the store." Id. at 31. He recalled telling Armstrong that there was a video, but he "[did]n't know if [it was] true or not." Id. at 32. He was basing these statements "off of the other officers." Id. He testified that he "believe[d] I was told that it did have a video on a prior case." And that the video was "[p]ossibly" inside and outside as well. Id.

Armstrong was charged with domestic violence violation of a court order, elevated to a felony by either a finding of either two prior offenses, or by the commission of an assault. While trial was pending, he brought a motion to discharge counsel and asked the court to appoint him a new attorney. His request was denied. At trial, he again requested alternate counsel and cited the lack of knowledge of the whereabouts of the surveillance video as one basis for his request.

Regarding unanimity, the jury was instructed that: "To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (4)(a) or (4)(b),

3

has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt." Clerk's Papers (CP) at 28. Consistent with this instruction, in closing argument, the prosecutor told the jury that there were two ways to commit the crime, and that the jury did not "have to be unanimous as to which of the alternative means were present; you just have to be unanimous that all four of the elements have been satisfied. VRP (7/31/14) at 18.

Armstrong was found guilty of domestic violence violation of a court order as charged. He appeals.

DISCUSSION

Armstrong argues that his right to a unanimous jury verdict under article I, section 21 of the Washington Constitution, was violated when the jury was expressly instructed that it did not have to be unanimous as to whether a conviction rested on two prior violations, or on a finding that an assault was committed. The State argues that express unanimity is not required where there is sufficient evidence to support each of the alternative means of committing a crime.

Both sides agree that the felony violation of a no-contact order is an "alternative means" crime. An "alternative means" crime is one, which provides that the proscribed criminal conduct may be proved in a variety of ways. State v. Smith, 159 Wn.2d 778, 784, 154 P.3d 873 (2007). Under RCW 26.50.110(4), any assault that is a violation of a valid protection order that does not amount to first- or second-degree assault, is a class C felony. If a defendant has been convicted

of at least two prior violations of a protection order, the third violation is also a class C felony. RCW 26.50.110(5).

Under Washington law, a defendant may only be convicted if the members of the jury unanimously conclude that he or she committed the criminal act with which he or she was charged. State v. Noltie, 116 Wn.2d 831, 842, 809 P.2d 190 (1991). A defendant's right to a unanimous verdict is rooted in the Sixth Amendment to the United States Constitution and in article I, section 22 of the Washington Constitution. State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988) (abrogated on other grounds by In re Personal Restraint of State v. Pierre, 118 Wn.2d 321, 328, 823 P.2d 492 (1992)) (citing U.S. Const. amend. VI; Wash. Const. art. I, § 22). This right may also include the right to a unanimous jury determination as to the means by which the defendant committed the crime when he or she is charged with an alternative means crime. When there is sufficient evidence to support each of the alternative means of committing the crime, express unanimity as to which means is not required. State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). If there is insufficient evidence to support any of the means, however, a particularized expression of jury unanimity is required. State v. Ortega-Martinez, 124 Wn.2d 702, 707-08, 881 P.2d 231 (1994).

Armstrong concedes that the evidence is sufficient to support both alternative means of committing a felony violation of a no-contact order. He argues that "the preferred practice is to provide a special verdict form and instruct the jury that it must unanimously agree as to which alternative means the State

5

proved." Brief of Appellant at 6 (citing State v. Whitney, 108 Wn.2d 506, 511, 739 P.2d 1150 (1987)).

We agree and "strongly urge" counsel and trial courts to "heed [the state supreme court's] notice that an instruction regarding jury unanimity on the alternative method is preferable." Ortega-Martinez, 124 Wn.2d at 717, n.2 (citing Whitney 108 Wn.2d at 511. An instruction would "eliminate potential problems which may arise when one of the alternatives is not supported by substantial evidence, . . ." Id. However we conclude that such an instruction was not required in this case. Because sufficient evidence supports a finding that Armstrong committed a felony violation of a no-contact order by either means, we find no violation of his right to jury unanimity.[1]

Armstrong next argues that his due process rights were violated because the State failed to preserve evidence that was potentially exculpatory. He had been told that there was security videotape footage that depicted the bus stop and the events that took place, but it was never obtained. The State acknowledges that the police did not obtain any surveillance video recordings, but argues that Armstrong cannot demonstrate that such video would have any exculpatory value, or that their failure to obtain it was in bad faith.

---

[1] Armstrong acknowledges the supreme court precedent, most recently Owens, 180 Wn.2d 90, which holds that express unanimity is not required when the evidence is sufficient to support each alleged alternative means of committing the crime. Reply Brief at 11-12. But he contends that because the cases that so hold are "both incorrect and harmful," we should disregard them. Id. at 12-13. We decline the invitation. We are bound to follow our Supreme Court's precedents and have no authority to ignore or overrule them. 1000 Virginia Ltd. P'ship v. Vertecs Corp., 158 Wn.2d 566, 590, 146 P.3d 423 (2006).

The Fourteenth Amendment requires that criminal prosecutions conform to prevailing notions of fundamental fairness, and that criminal defendants be given a meaningful opportunity to present a complete defense. State v. Wittenbarger, 124 Wn.2d 467, 475, 880 P.2d 517 (1994) (citing California v. Trombetta, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). The prosecution has a duty to disclose "material exculpatory evidence" to the defense and a related duty to preserve such evidence for use by the defense. Id. The failure do so is a violation of due process which necessitates the dismissal of criminal charges. Id.

"Material exculpatory evidence" is that which possesses both an exculpatory value that was apparent before it was destroyed and is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Id. at 475. If evidence is only "potentially useful," however, a defendant must show bad faith on the part of the police. Id. at 477. Potentially useful evidence is that "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." State v. Groth, 163 Wn. App. 548, 557, 261 P.3d 183 (2011).

Here, the store clerk testified that the outside cameras "basically ... cover just the gas pumps." He testified that "[y]ou may see a slight view, low view shot, of maybe the bus stop, a small piece of the sidewalk. But that's it." VRP (7/30/14) at 47. The only reasonable inference from this uncontradicted testimony is that even if the video had been retained it would likely have revealed little about what took place at the bus stop. Based on this record, we cannot say

the video is materially exculpatory and conclude that, at best, it would be only potentially useful to the defense.

Armstrong acknowledges that he has the burden to show that the failure to preserve potentially useful evidence was "improperly motivated." Br. of Appellant at 19, (quoting Wittenbarger, 124 Wn.2d at 478. Armstrong argues that "bad faith" in this context requires some showing of "connivance." United States v. Loud Hawk, 628 F.2d 1139, 1146 (9th Cir.1979) overruled on other grounds by United States v. W. R. Grace, 526 F,3d 489 (9th Cir. 2008)). He first argues that the failure to collect the videotape was an act of bad faith because the police made representations about its existence, its evidentiary value, and their intention to use it to challenge Armstrong's account of the events. He acknowledges that the police have no duty to assist the defendant in obtaining exculpatory evidence, but he argues that they have a duty to not misrepresent the availability of evidence in a way that would cause the defendant to not seek to prove his case by other means.

The State admitted that it used a ruse, but argues that its failure to follow up and investigate did not constitute bad faith. The State argues that it was mere oversight. We agree. Armstrong's bad faith argument is based on the fact that he was led to believe that the police had a videotape when they did not, not that it was intentionally destroyed. The officers testified that they were unaware of whether there actually was footage of the incident at the bus shelter, even though they referred to it when questioning Armstrong after hearing another officer mention it. The testifying officers assumed that it was the responsibility of another

8

to collect it. Without a showing that the State intentionally destroyed the evidence or made an effort to conceal it from Armstrong, the failure to obtain the video recording was not a violation of due process. As in Youngblood, where a biological sample was not properly refrigerated, this oversight "can at worst be described as negligent." 488 U.S. at 58.

Next, Armstrong argues that the police failed to follow their own routine procedures for collecting evidence. Compliance with departmental destruction policies is evidence of good faith. See, e.g., United States v. Barton. 995 F.2d 931, 935-36 (9th Cir.1993); United States v. Heffington, 952 F.2d 275, 280–81 (9th Cir.1991). But, contrary to Armstrong's argument, "the destruction of evidence ... in violation of explicit policy and procedures ... [does] not ipso facto establish bad faith." Groth, 163 Wn. App. at 559–60 (citing United States v. Montgomery, 676 F.Supp.2d 1218, 1245 (D.Kan.2009)).

Here, there was no evidence in the record that the police had routine procedures or policies for collecting evidence that included gathering or preserving surveillance video footage. The store clerk testified that he had previously seen police go upstairs to view videos with employees or store management. The fact that the officers did not view or obtain the video in this incident is not indicative of a failure to follow routine procedures, nor would it give rise to an inference of bad faith.

Finally, Armstrong argues that the court should reverse because of the unfairness of being led to believe that the video evidence would be available to exonerate him. While his frustration may be understandable, Armstrong's

9

reliance on the officers' representations does not amount to bad faith or a violation of due process.

Statement of Additional Grounds

Armstrong submits a statement of additional grounds (SAG) under RAP 10.10, where he first raises a number of issues related to the evidence presented at trial. We limit our review of issues raised in a statement of additional grounds to those that inform the court of the nature and occurrence of the alleged errors. RAP 10.10(c). We do not address issues involving facts or evidence not in the record, as those are properly brought in a personal restraint petition and not a statement of additional grounds. State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

Armstrong argues that the recording of the 911 call had been tampered with and that there were discrepancies in the statements made by the store clerk about whether he chased Karavan. He claims that certain police reports were withheld and others were inaccurate with regard to any in-store chases. Armstrong also argues that Karavan had motive to cause a violation in order to take part in the victim compensation program offered by the prosecuting attorney. Finally, he raises as grounds for reversal the fact that a corrections facility guard opened Armstrong's mail containing his attorney's brief. None of these issues, if proven, would have any relevance to the charges against Armstrong, nor would they negate any element of the offense. To the extent that these issues involve facts or evidence not in the record, they would be properly brought in a personal restraint petition.

Armstrong argues ineffective assistance of counsel and purposeful prejudicing of his defense in retaliation for his request for new counsel. In order to prevail on a claim of ineffective assistance, a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The first prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness based on consideration of all the circumstances. State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). The second prong requires the defendant to show there is a reasonable probability that, but for counsel's conduct of errors, the results of the proceeding would have been different. Id. There is a strong presumption of effective assistance. In re Detention of Moore, 167 Wn.2d 113, 122, 216 P.3d 1015 (2009). If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel. State v. Lord, 117 Wn.2d 829, 883, 822 P.2d 177 (1991).

Armstrong refers to counsel's failure to object to the State's characterization of his conduct as "'chasing,'" and omission of the details of Armstrong's head wound. SAG at 3. He also claims that his attorney asked questions that damaged his case, in particular when he asked Karavan how many times Armstrong allegedly hit her. This court will not find ineffective assistance of counsel if the challenged actions of counsel go to the theory of the case. State v. Varga, 151 Wn.2d 179, 199, 86 P.3d 139 (2004). Armstrong fails

to show that these statements and omissions were not part of a legitimate trial strategy.

Affirmed.

Specman, C.J.

WE CONCUR:

Leach, J.

Appelwick, J.